IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEVEN W. BOMBERGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 16-1071-RGA |
| | ) |
| BENCHMARK BUILDERS, INC., | ) |
| a Delaware corporation, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM

Plaintiff filed this action against Defendant claiming violations of the Age Discrimination in Employment Act ("ADEA") under 29 U.S.C. § 621 *et seq.* ("Count I"), the Delaware Discrimination in Employment Act ("DDEA") under 19 *Del. C.* § 710 *et seq.* ("Count II"), and the Delaware Common Law Covenant of Good Faith and Fair Dealing ("Count III"). (D.I. 4 at ¶¶ 39-50). Presently before the Court is Defendant's Motion to Dismiss Count II and Count III of Plaintiff's First Amended Complaint. (D.I. 7). The issues have been fully briefed. (D.I. 8, 11, 17). For the reasons set forth below, Defendant's Motion is GRANTED.

### I.   BACKGROUND

This dispute arises out of Plaintiff Steven W. Bomberger's termination of employment from Defendant Benchmark Builders, Inc. in June, 2015. Bomberger was an employee, minority shareholder and former President of Benchmark. (D.I. 4 at ¶ 5). In 1988, Bomberger co-founded Benchmark with Francis Julian, Richard Julian and Gene Julian. (*Id.* at ¶ 6). Bomberger executed an employment agreement with Benchmark which included a provision for acquiring stock, and which stated, "[t]he redemption price of all stock is the book value of the stock shares." (*Id.* at ¶¶

1

7-8) (alteration in original). In 1994, the four principal shareholders entered into a share repurchase agreement that provided a mechanism for determining the buyback price of stock when any shareholder left the company.[1] (*Id.* at ¶¶ 10-11).

The Complaint alleges that in late 2012, Francis and Richard attempted to shift management control to their children (the "Successor Generation") through a proposal "to amend the [share repurchase agreement] so that a Principal Shareholder could transfer stock to his children." (*Id.* at ¶ 21). This proposal did not benefit Bomberger because he did not have children working for Benchmark. (*Id.*). Shortly after the amendment, "the Successor Generation began asserting control over Benchmark" and brought in younger employees. (*Id.* at ¶ 23). At an April 24, 2015 meeting of the Benchmark Board, Bomberger suggested to Francis, Richard, and others within Benchmark that he would resign if they were going to dissolve Benchmark and attempt to freeze him out of the company as they had done to Gene. (*Id.* at ¶ 26). Those present

---

[1] The relevant portions of the share repurchase agreement are Articles 4 and 5. Article 4 governs resale upon termination and states:

> "If the employment of an employee with the corporation is terminated (a) from the date of this agreement by employee's resignation, discharge, with or without cause, disability, or any other reason except the employee's death or total disability . . . , employee shall be bound to sell to corporation forthwith, and corporation shall be bound to purchase from employee, the shares at the lower of (1) the sale price at which they were originally sold pursuant to this agreement by corporation to employee . . . or (2) the then current book value of the shares."

(D.I. 4 at ¶ 12). Article 5 governs resale upon retirement or total disability and states:

> "In the event a Principal Shareholder ceases to be employed by the corporation by reason of retirement or total disability, he must offer to sell his shares to the other Principal Shareholders in the manner provided in Article 2 hereof . . . *Principal Shareholders must give at least three years notice of intent to sell stock* in order for the other Principal Shareholders to prepare for payment . . . *Retirement is defined as a voluntary termination on or after a Shareholder's sixty-second birthday.* Any termination, other than one due to death or total disability, prior to a Principal Shareholder's sixty-second birthday shall result in a resale on termination in accordance with Article 4."

(*Id.* at ¶ 13).

at the meeting interpreted this as a resignation, and on May 29, 2015, Francis "sent Bomberger a letter that purported to 'confirm [Bomberger's] resignation as President of the Company' and unilaterally set June 30, 2015 as Bomberger's last day of employment with Benchmark." (*Id.* at ¶ 28) (alteration in original). The letter also stated that Benchmark would repurchase Bomberger's shares at $747.00 per share, which was significantly less than net book value, and "that Bomberger would be replaced by Matthew Egan," who was fifteen years younger than Bomberger. (*Id.* at ¶¶ 28-29). Francis subsequently sent an email to Benchmark's staff and trade partners that falsely stated Bomberger was retiring. (*Id.* at ¶ 48). Bomberger was nine months away from turning fifty-nine, at which time he would have been able to give three years notice of intent to retire pursuant to Article 5 of the share repurchase agreement. (*Id.* at ¶ 28). A retirement pursuant to Article 5 would have required Benchmark to repurchase Bomberger's 150 shares for their full net book value of $3,925.15 per share, which was significantly higher than both the original purchase price of $100.00 per share and the $747.00 per share price stated in the May 29, 2015 letter.[2] (*Id.* at ¶ 32). Thus, by terminating his employment before he turned fifty-nine, Benchmark denied Bomberger more than $476,000. (*Id.* at ¶ 33).

Bomberger submitted an Intake Questionnaire to the Delaware Department of Labor (the "DDOL") on October 8, 2015, which was 118 days after his termination.[3] (*Id.* at ¶ 36). The

---

[2] Upon termination of Bomberger's employment, Benchmark should have repurchased the shares at the original purchase price of $100.00 per share pursuant to Article 4 of the share repurchase agreement. Benchmark appears to have decided arbitrarily to repurchase the shares at $747.00 per share. In either event, Bomberger was denied the net book value of $3,925.15 per share, which he would have received upon retirement pursuant to Article 5 of the share repurchase agreement.

[3] Although the May 29, 2015 letter set June 30, 2015 as Bomberger's last day of employment, his employment was actually terminated on June 12, 2015. (D.I. 4 at ¶ 35).

3

document stated, in bold type, "**THAT COMPLETION OF THE ENCLOSED FORMS DOES NOT CONSTITUTE FILING A CHARGE OF DISCRIMINATION.**" (D.I. 4-2 at 2). On October 26, 2015, Bomberger filed a charge of discrimination with the DDOL alleging violations of the DDEA and ADEA. (D.I. 4-4 at 2). The DDOL determined that it did not have jurisdiction and transferred Bomberger's complaint to the EEOC. (D.I. 4 at ¶ 37). On September 27, 2016, "[t]he EEOC issued Bomberger a Notice of Right to Sue," but Bomberger was never issued a Delaware Right to Sue Notice by the DDOL. (*Id.* at ¶ 38).

## II. LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 347. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [accused] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. DISCUSSION

### A. Violation of the DDEA (Count II)

Benchmark's Motion to Dismiss Count II of the Complaint is granted because Bomberger did not timely file a charge of discrimination with the DDOL as required by the DDEA.[4] The intake questionnaire submitted by Bomberger 118 days after his termination does not constitute a charge of discrimination. This Court, consistent with the Supreme Court in *Fed. Express Corp. v. Holowecki,* 552 U.S. 389 (2008), has previously held that an intake questionnaire is not charge of discrimination when the questionnaire cannot "be construed as a request to take action" and explicitly states that completion of the form does not constitute a charge. *See Hayes v. Delaware State University,* 726 F. Supp. 2d 441, 453 (D. Del. 2010) (holding intake questionnaire filed with DDOL that specifically stated it "does not constitute the filing of a charge" was not a charge despite similarities in content between the two documents). The intake questionnaire in this case,

---

[4] At the time Bomberger filed his charge of discrimination, the DDEA required "[a]ny person claiming to be aggrieved by a violation of this chapter [to] first file a charge of discrimination within 120 days of the alleged unlawful employment practice . . . ." 19 *Del. C.* § 712(c)(1). Although the statute was amended to extend the filing deadline to 300 days, the amendment only became effective on July 19, 2016, nine months after Bomberger filed his charge.

5

similar to the intake questionnaire in *Hayes*, stated in in bold type, "**THAT COMPLETION OF THE ENCLOSED FORMS DOES NOT CONSTITUTE FILING A CHARGE OF DISCRIMINATION.**" (D.I. 4-2 at 2). The DDOL did not consider the questionnaire to be a charge, and it cannot be construed as a request to take action because it does not contain any specific requests for relief. Because the intake questionnaire makes clear it is not a charge of discrimination, and Bomberger only submitted an actual charge more than 120 days after his termination, his claim is time-barred by the statute.

Bomberger argues that even if the intake questionnaire does not constitute a charge of discrimination, the amendment to the DDEA extending the filing deadline for a charge to 300 days should apply retroactively to save his claim. (D.I. 11 at 16-18). I refuse to apply the amendment retroactively because Benchmark's substantive rights will be affected. Statutory amendments generally apply prospectively "unless the legislature expressly states, to the contrary, that the amendments shall be retrospective . . . [or the amendment] relates to practice, procedure or remedies and does not affect substantive or vested rights." *Fountain v. State*, 139 A.3d 837, 841 (Del. 2016) (quoting *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 354 (Del. 1993)). Retroactive application is not appropriate if "a person's rights and obligations will be affected." *Konstantopoulous v. Westvaco Corp.*, No. 90-146-CMW, 1992 U.S. Dist. LEXIS 9466, at *19 (D. Del. June 19, 1992). In this case, the amendment to the DDEA extending the filing deadline to 300 days does not state that it applies retroactively. The amendment is not necessarily procedural because retroactive application would subject Benchmark to a claim which would not otherwise exist, thereby affecting its rights and obligations. Therefore, the amendment cannot be applied retroactively and Plaintiff's claim is time-barred.

6

## B. Violation of the Delaware Common Law Covenant of Good Faith and Fair Dealing (Count III)

Benchmark's Motion to Dismiss Count III of the Complaint is granted because Benchmark did not falsify Bomberger's employment records. In the employment context, there are four circumstances in which an employer's actions may violate the implied covenant of good faith and fair dealing:

> (i) [W]here the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one"; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) (citing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442-44 (Del. 1996). Bomberger asserts he has alleged facts that satisfy the fourth circumstance.

First, he argues Benchmark created a false reason for terminating him when it made up that he had voluntarily resigned. (D.I. 11 at 20-21). Creating a false reason for termination, however, does not satisfy the fourth circumstance of *Lord* and is therefore insufficient grounds for bringing a claim for breach of the implied covenant. *See Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 191 (D. Del. 2001) ("[E]mployers are only culpable for the *manufacture* of grounds for dismissal, not for the statement of a false reason for dismissal.").

Bomberger next argues that Benchmark's May 29, 2015 letter and its emails to staff and trade partners, which falsely claimed that Bomberger voluntarily resigned, constituted falsifications of employment records. (D.I. 11 at 20-21). This argument is also misplaced

7

because the fourth circumstance of *Lord* requires that the employer actually falsify or manipulate employment records to create fictitious grounds for termination. Benchmark's conduct, however, amounted to no more than a memorializing of its false reasons for termination in writing. This is insufficient to sustain a claim for breach of the implied covenant.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Count II and Count III of the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (D.I. 7) is GRANTED. Plaintiff has not requested leave to amend. It does not appear that Plaintiff could amend his Complaint to state the claims he has asserted in Counts II and III. Thus, leave to amend is not granted.

An appropriate order will be entered.